214 So.2d 401 (1968)
Dunice P. BRASSEAUX, Plaintiff-Respondent.
v.
Ray J. GIROUARD, Defendant-Relator, and
Pennsylvania Millers Mutual Insurance Company, Defendant-Respondent.
No. 2418.
Court of Appeal of Louisiana, Third Circuit.
September 25, 1968.
Rehearing Denied October 16, 1968.
Writ Refused December 10, 1968.
*404 J. Minos Simon, Lafayette, for defendant-relator.
Mouton, Champagne & Colomb by George J. Champagne, Jr., Lafayette, for defendant-respondent.
Domengeaux, Wright & Bienvenu by W. Paul Hawley, Lafayette, for plaintiff-respondent.
TATE, Judge.
These proceedings are before us under our supervisory powers. We granted certiorari on the defendant Girouard's application to review two interlocutory rulings presenting substantial issues of first impression in Louisiana. They concern (I) the trial court's refusal to disqualify counsel for Girouard's insurer from further appearance in these proceedings because of an alleged conflict of interest and (II) the court's refusal to suppress certain discovery depositions taken by that counsel for the insurer. We will discuss these issues separately.

I.

(a) Disqualification of counsel because of a conflict of interest arising from prior representation of an opposing party.

The plaintiff Brasseaux sues the defendant Girouard for personal injuries. They are claimed to have resulted when Girouard either intentionally or negligently shot Brasseaux. By supplemental and amending petition, Girouard's liability insurer (Pennsylvania) was impleaded as a codefendant. Pennsylvania's primary defense, in the direct action by Brasseaux against it, is that its policy does not apply to the accident in question because of a policy clause excluding coverage of injuries caused intentionaly by its insured (Girouard). This primary defense, of course, is antagonistic to the interest of the defendant Girouard, its insured.
After certain discovery depositions were taken, by rule to show cause Girouard sought to have the insurer's counsel disqualfied from further representation of it in these proceedings. The basis for this move by Girouard is an alleged conflict of interest arising from counsel's earlier representation of the insured, Girouard, in connection with the subject matter of this suit.
We will set forth at some length the applicable principles, since there was misunderstanding of them at the hearing below and since this is a case of first impression in this state.
As an inherent attribute of his profession, an attorney may not represent different interests which are hostile, or in conflict with one another. The canons of ethics of both national and state bar associations forbid the representation of conflicting interests except with consent of opposing parties and then only in limited circumstances. They further provide that the obligation to represent the client with undivided fidelity outlasts the lawyer's employment. Forbidden also, thus, is the subsequent acceptance by the lawyer of retainer by others adversely affecting any interest of his former client with respect to which the lawyer was retained.
See: Canons Six and Thirty-Seven, A.B.A. Canons of Professional Ethics, *405 which verbatim were adopted as Sections 6[1] and 37[2] of Article XIV, Articles of Incorporation, Louisiana State Bar Association, promulgated as rule of the Supreme Court of Louisiana by order of March 12, 1941 (found at pp. 121, 165, 177 of Volume 21A, West's Louisiana Revised Statutes, 1964 volume); DRINKER, LEGAL ETHICS 103-30, 131-39 (1953); Annotation, Propriety and effect of attorney representing interest adverse to that of former client, 52 A.L.R.2d 1243; Kaplan, Forbidden Retainers, 31 NYU L.Rev. 914 (1956).
When in violation of this principle and these canons an attorney does represent conflicting interests or does accept subsequent retainer adverse to an interest for which retained by a former client, the court in which the proceeding is pending should, upon timely motion by former client who objects to such possible violation of his confidence, disqualify counsel from continuing with the conflicting representation of the subsequent client. See: Comment, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-Firm Conflicts of Interest, 73 YLJ 1058 (1964) and Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 YLJ 917 (1955)[3] and decisions cited therein; COUNTRYMEN & FINMAN, THE LAWYER IN MODERN SOCIETY, 89-96, 117-135 (1966)[4]; Annotation, AttorneyFormer Client, 52 A.L.R.2d 1243 at Sections 14-16, pp. 1279-86; 7 C.J.S. Attorney and Client §§ 47, 48; 7 Am.Jur.2d "Attorneys at Law", Sections 156, 159.
See also such decisions as: United States v. Trafficante, 328 F.2d 117 (CA5, 1964); W. E. Bassett Co. v. H. C. Cook Co., 201 F.Supp. 821 (D.C., Conn.1961), aff'd. 302 F.2d 268 (CA2, 1962); Consolidated Theatres, Inc. v. Warner Bros. Circuit Management *406 Corp., 216 F.2d 920, 52 A.L.R.2d 1231 (CA2, 1954); General Contract Purchase Corp. v. Armour, 125 F.2d 147 (CA 5, 1942); Wilson v. Wahl, 182 Kan. 532, 322 P.2d 804 (1958); Boyd v. Second Judicial Dist. Court, 51 Nev. 264, 274 P. 7 (1929); Wingilia v. Ashman, 241 Mich. 534, 217 N.W. 909 (1928); Cochran v. Cochran, 333 S.W.2d 635 (Tex.Civ.App.,1960); Prichec v. Tecon Corp., 139 So.2d 712 (Fla.App., 1962).
Reasons assigned for the fairly strict disqualification principle followed by all Amercan jurisdictions in which the issue has arisen, have included its necessity in order to encourage maximum disclosure by clients to counsel of all relevant facts, without fear of future adverse use of this confidence. The courts also express as rationale that public confidence in the legal profession as a whole might otherwise be impaired. For these reasons of public policy, the general rule is that doubts in borderline cases should be resolved in favor of disqualification, with the important injunction being reiterated that, for these reasons, even the appearance of conflict should be avoided.[5]
As the sources cited show, the modern decisions hold that, to prove the existence of the lawyer's obligation not to represent a competing interest, the former client need prove only that matters embraced within the present suit are substantially related to the matters or cause of action wherein the attorney previously represented him. The courts may then infer the receipt of confidences violatable by the subsequent representation.
Probably the preponderant number of recent decisions further hold that disqualfication does not depend upon whether the attorney actually would or might be using or misusing confidential information acquired from the former client (see, e. g., Cord v. Smith, 338 F.2d 516, CA 9, 1964, mandate modified, 370 F.2d 418, 1966, as well as many of decisions previously cited), in view of the policy basis of maintaining public confidence in the legal profession by avoiding even the appearance of impropriety in the eyes of the public. Other commentators suggest that disqualification is too stringent when in truth there is no real possibility of a former client's confidence being abused by the subsequent representation. For present purposes, we need do no more than point out this difference in view.
Not only the individual attorney who previously represented the client is thus subject to disqualification. An entire law firm is subject to disqualification whenever grounds for disqualification exist against any of its partners or law-associates. See Comment, previously cited, at *407 73 YLJ 1059-61 (citing many decisions to this effect); Kaplan, cited above, at 31 NYU L.Rev. 926-27; DRINKER, LEGAL ETHICS 106 (1953); ABA OPINIONS OF COMMITTEE ON PROFESSIONAL ETHICS AND GRIEVANCES (1957), Opinions 33, 49, 103, 142, 192. See, for instance (among the many decisions so holding), Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp., 216 F.2d 920, 927, 52 A.L.R.2d 1231, 1241 (1954).
The canons and the duty to avoid conflicting representation apply in all instances of lawyer-client relationship, whether or not the relationship includes the agreement to pay a fee for the representation. DRINKER, p. 106; ABA OPINION 83. For the attorney-client relationship is not dependent on the payment of a fee; "retainer"[6] is sufficiently established when it it shown that the advice and assistance of a lawyer are sought and obtained in matters relevant to his profession. 7 C.J.S. Attorney and Client § 65; 7 Am.Jur.2d "Attorneys at Law", Section 91; see, e. g.: Nicholson v. Shockey, 192 Va. 270, 64 S.E.2d 813 (1951); Prigmore v. Hardware Mut. Ins. Co., 225 S.W.2d 897 (Tex.Civ.App., 1949); Shoup v. Dowsey, 134 N.J.Eq. 440, 36 A.2d 66, 84-55 (1944).
Nevertheless, generally the former client may expressly or tacitly waive his objection and consent to his former counsel now representing a party with interests adverse to those involved in the lawyer's former representation of him. DRINKER, 120-22, also 114-18; Annotation cited, at 52 A.L.R.2d 1268 (Section 9); 7 C.J.S. Attorney and Client § 48; 7 Am.Jur.2d "Attorney at Law", Section 157.[7] This is recognized by implication or expressly in many of the decisions previously cited. Tacit waiver has expressly been held in several instances to prevent invalidation of previous proceedings through the belated urge of cause for disqualification. Wojahn v. Faul, 242 Minn. 33, 64 N.W.2d 140 (1954); Gottwals v. Rencher, 60 Nev. 35, 47, 92 P.2d 1000, 98 P.2d 481, 126 A.L.R. 1262 (1954); Michel v. McKenna, 199 Wis. 608, 227 N.W. 396 (1929).
The specific conflict of interest before us arises out of counsel's previously representing both the insured and its insurer, although they now have conflicting interests. The principle of express consent is held sometimes to justify simultaneous or successive representation of both an insured and his liability insurer; this justification is based upon the usual policy provision requiring the insured to permit the insured's attorney to represent him in claims allegedly covered by the policy. DRINKER, pp. 114-18; ABA Opinion 282; Louisiana Opinion 249, 13 La.B.J. 153 (1965).
Of course, the attorney cannot appear for and against the same party simultaneously, ABA Opinion 222, nor for and against the same issue in representation of different parties successively, Louisiana Opinion 249 cited below. However, if counsel has simultaneously represented the insurer (primarily) and the insured (by virtue of such a policy provision), then is counsel barred from subsequent representation of the insurer or insured (alone) after a conflict of interest arises?
In the Louisiana bar association's view, the insurer's counsel is not barred fom the subsequent representation of the insurer *408 adverse to the insured, even though the attorney may have received some information from the insured. Opinion 249, 13 La.B.J. 1953 (1965). The committee stated that any conflict of interest in this subsequent (not simultaneous) adverse representation was obviated because of the insured's consent in advance, through the policy clause that required the insurer's counsel to represent him also. See also Skillman v. McDowell, 317 Ill.App. 85, 45 N.E.2d 574 (1942), criticized at Kaplan, 31 NYU L.Rev. 924. Other opinions question the propriety of subsequent adverse representation under these circumstances. ABA Opinion 247.
The present facts.
The question is whether the distinguished Lafayette firm of Mouton, Champagne & Colomb (hereinafter referred to as the MC firm) should disqualify itself from further representation of Pennsylvania in these proceedings, because an associate of that firm (Mr. Babin) had earlier represented Girouard in connection with the incident sued upon.
According to the allegations of the petition, the defendant Girouard shot the plaintiff Brasseaux on June 23, 1967. Brasseaux filed suit for his personal injuries in August, 1967; initially, against Girouard alone. Upon learning from Girouard by discovery interrogatories of a liability insurance policy issued to him by Pennsylvania, Brasseaux amended his petition on October 17th, for the first time impleading Pennsylvania as a codefendant in these proceedings. Pennsylvania (through the MC firm) immediately (in November) informed Girouard of its policy defense (intentional injuries excluded) and the resulting conflict of interest, advising him that under these circumstances Girouard might at his own expense retain personal counsel to collaborate with the MC firm as Pennsylvania's attorneys.
This letter was signed for the MC firm by Mr. Champagne as a partner of it. Previously, the answers to the original and first supplemental petitions and to the interrogatories had been signed by the MC firm through Mr. Babin, its associate. The record reflects that Girouard had consulted with the associate lawyer, Mr. Babin, in connection with criminal proceedings immediately after the shooting of June 23, 1967, and also after suit was filed, when Girouard had turned over to Mr. Babin his insurance policy with Pennsylvania.
The record does not show whether Mr. Babin's first association with the case was in his capacity as counsel retained for Girouard by Pennsylvania through the policy clause conferring Girouard's advance consent. Efforts to develop information concerning Girouard's initial retainer of Mr. Babin were thwarted, because Girouard claimed that the lawyer-client privilege protected him from revelation of this information. Likewise, the testimony of the partner, Mr. Champagne, testifying for the MC firm as counsel for Pennsylvania, does not disclose this information under the assumption, inter alia, that disclosure is prevented by the attorney-client privilege.
Thus, the record does not show if the MC firm's initial representation of Girouard (through Mr. Babin, its associate) was truly as personal counsel for this party or whether instead this representation was primarily on behalf of Pennsylvania for Girouard as the insured, through the insurer's retainer and agreement to pay any attorney's fee incurred on his behalf. (The questioning and vague responses indicate that Girouard was not obligated to pay Mr. Babin any fee for his serving as counsel in the earlier criminal and the present civil proceedings.)
Under the Louisiana bar association's application of Canon Six, these circumstances may be determinative. For the subsequent representation of Pennsylvania in opposition to the interests of Girouard, its insured, may then be excused through the insured's consent in advance that Pennsylvania's attorney (primarily) simultaneously serve as his own until a conflict of interest should develop. At such time, the *409 MC firm may continue to represent Pennsylvania alone with propriety due to the advance consent and prior full disclosure.
Because of this circumstance, and also because the case was tried below in the absence of prior Louisiana expression as to the applicable principles[8], we have concluded that, in the absence of relevant evidence regarding Girouard's retainer of Mr. Babin (and thus of the MC firm), it will be preferable to set aside the trial court order denying the disqualification motion and to remand these proceedings for further hearing and ruling below, so that trial counsel may produce the appropriate evidence or take appropriate action in the light of the principles enunciated above.
To aid the trial court in its ruling, we think it appropriate to rule upon two subsidiary interlocutory issues which will be or have been raised in the disqualification proceeding:

(1)
The right of a former client to urge disqualification of an opposing counsel may be waived by the former client's failure to raise the issue early in the proceedings. See, e. g., Gottwals v. Rencher, 60 Nev. 35, 47, 92 P.2d 1000, 98 P.2d 481, 126 A.L.R. 1262 (1940). Otherwise, disqualification could be used as a purely dilatory or obstructive tactic. (Here, for instance, the plaintiff's suit has been delayed for approximately six months through this inter-defendant dispute re disqualification.) Similarly, in the absence of unusual circumstances, disqualification should not be used to invalidate prior proceedings taken without objection at the time as to a then known conflict of interest (see authorities cited in paragraph of text at footnote 7 above), even if disqualification is ordered as to any further representation by counsel subsequent to the order.
Applying these principles, we hold:
(a) The defendant Girouard has not waived his right to urge future disqualification of the MC firm. The first pleadings filed by Pennsylvania adverse to Girouard was its answer of January 17, 1968. The record does not reflect that Girouard retained his independent personal counsel (Mr. Simon) in these civil proceedings until early February, 1968. The disqualification motion was filed on March 14, 1968. In this short interval, although discovery depositions were taken (of which Mr. Simon received notice for Girouard), no substantial change of position took place.
(b) However, Girouard has waived any right to invalidate, on the ground of the MC firm's disqualification to act, the discovery depositions and any pleadings filed prior to Girouard's motion of March 14, 1968 to disqualify the MC firm, as well as to invalidate any rulings which were made on Pennsylvania's motions filed prior thereto.

(2)
If there was simultaneous representation, Girouard cannot prevent disclosure by the MC firm of the circumstances of his retainer of Mr. Babin (and thus of the firm) by now claiming the lawyer-client privilege.
(a) Canon 37 does not forbid disclosure by the MC firm or its associate of the circumstances of Girouard's retainer *410 of the MC firm to represent him, since a lawyer accused of improper conduct by his client is expressly permitted to testify to the truth. See last paragraph of Canon 37, quoted in full in footnote 2; DRINKER, 138-39.
(b) Similarly, in suits between the insurer and the insured, communications made by the insured to the insurer's counsel during a period of simultaneous representation are not privileged as against the co-client, at least where the issue to which the communications relate concern matters of the legal representation of the insured. Henke v. Iowa Home Mutual Cas. Co., 249 Iowa 614, 87 N.W.2d 920 (1958). Furthermore, the privilege is not necessarily applicable where the issue concerns adequate cooperation or not of the insured with the insurer's counsel, Shafer v. Utica Mut. Ins. Co., 248 App.Div. 279, 289 N.Y.S. 577 (1936), or in other circumstances where a policy defense is involved and the communication does not result from the insured's furnishing full information because of his contractual duty to do so (with a reciprocal right to claim privilege against its use as adverse admission to the attorney retained for him by the insurer whom he was mandatorily required to accept). Annotation, Privileged Communication to Insurers, 22 A.L.R.2d 659, 662 (Section 3). Cf. also LeBlanc v. Broussard, La.App. 3 Cir., 198 So.2d 193.
Of course, if indeed Girouard retained Mr. Babin as his counsel in the earlier criminal proceedings (i. e., if Mr. Babin and thus the MC firm was not furnished Girouard by Pennsylvania in its capacity of insurer), the principles for non-application of the privilege during simultaneous retainer are not pertinent for the period of sole representation. However, even then, ordinarily no privilege prevents the lawyer from testifying to the fact of retainer or the name of the client(s) retaining him (as distinguished from the subject matter of the employment). Behrens v. Hironimus, 170 F.2d 627 (CA 4, 1948); Ex parte Griffith, 278 Ala. 344, 178 So.2d 169 (1965); Silverman v. Turner, 188 So.2d 354 (Fla.App., 1966); McCormick on Evidence, Section 94 (1954); 97 C.J.S. Witnesses § 283e; 58 Am.Jur. "Witnesses", Section 507.

II.

Suppression of discovery depositions.
The second ruling to be reviewed is the trial court's refusal to strike certain discovery depositions from the record. Girouard had moved for suppression of these depositions.
The substantial contention in this respect attacks any use of these depositions in these proceedings, because Pennsylvania and the plaintiff-appellee had allegedly proceeded with them in violation of a statutory provision that their taking be suspended. The depositions were taken in the absence of Girouard and his counsel. They had previously left the place of the deposition, first notifying opposing counsel that Girouard intended to apply to the court for a protective order under LSA-CCP Article 1454 as to another deposition.
LSA-CCP Article 1454 pertinently provides that at "any time" during the taking of a deposition the court may terminate or limit the examination upon motion of "any party"[9]. The article further pertinently provides that, upon demand of the objecting *411 party, "the taking of the deposition shall be suspended for the time necessary to make a motion for an order". This Code provision is based upon and substantially tracks Federal Rule of Civil Procedure 30(d).
Under the terms of the statute, it is mandatory for counsel to suspend taking the deposition upon notification by opposing counsel that he intends to apply to the court for a protective order under Article 1454. See similar interpretations of FRCP 30(d): Ross v. Cities Service Gas Co., 21 F.R.D. 34 (D.C.Mo.1957); Zuckerman v. Pilot, 1 F.R.D. 130 (S.D.N.Y.1940); 2A Barron & Holtzoff (Wright, ed.) Section 717 (1961); Annotation, Depositions Limiting or Terminating, 70 A.L.R.2d 685, 796 (Section 38).
To protect against the obvious possibility of abuse by frivolous suspension, the court is empowered by Article 1454 (see footnote 9 above) to assess reasonable costs and expenses, including attorney's fees and travel expenses, upon a party who unreasonably provokes suspension, as well as upon a party who needlessly causes suspension. Further, the payment of the penalty costs and expenses so assessed is a non-appealable interlocutory ruling, immediately executory. The Advertiser v. Tubbs, La. App. 3 Cir., 199 So.2d 426. (Such an interlocutory ruling may of course be reviewed upon appeal from the trial judgment. See Bielkiewicz v. Insurance Company of North America, La.App. 3 Cir., 201 So.2d 130.)
This suppression of the use of improperly taken depositions may, however, be with the reservation that, upon good cause shown and after contradictory hearing, the further use of these depositions may be permitted if the interests of justice and truth might otherwise be seriously damaged. Ross v. Cities Service Gas Co., 21 F.R.D. 34, 35 (W.D.Mo.1957).
The present facts.
With regard to the ruling presently before us, we have concluded that counsel for Girouard did not give adequate notice to justify suspending the taking of the depositions other than Girouard's.
The present record shows that defendant Girouard and six eye-witnesses (including the plaintiff Brasseaux) were present at the time and place assigned for their discovery depositions pursuant to prior notice given by Pennsylvania, LSA-CCP Article 1451, together with subpoenas of the nonparty, witnesses, LSA-CCP Article 1356.
Pennsylvania's counsel (Mr. Champagne) proceeded first to interrogate the defendant Girouard after he was duly sworn. Girouard refused to answer a series of questions directed to him by Mr. Champagne, stating that his answers might tend to incriminate him. When Mr. Champagne questioned him concerning conversations between himself and the defendant Girouard, then his counsel (Mr. Simon) objected on the contention that the information elicited was privileged communication resulting from a former attorney-client relationship. Mr. Simon served notice that, if opposing counsel "intends to pursue an inquiry into the confidential relationship that he had with counsel who is now propounding the question, I intend to interrupt the taking of the deposition for the purpose of getting an order from the court to prevent any such inquiry at all." Upon one further question of this nature being propounded, Mr. Simon formally notified counsel present of his intention to remove Girouard and himself from the conference to apply for an order to terminate or limit the deposition.
*412 On the same day as he withdrew from the examination of Girouard (February 22nd), Mr. Simon filed a motion to terminate and limit Pennsylvania's examination of Girouard. The sole complaint made by this motion concerned the allegedly improper examination of Girouard concerning matters privileged because of the former attorney-client relationship existing between him and Mouton, Champagne & Colomb. The only relief requested was to limit the scope of the further examination of Girouard (alone) so as to exclude reference to any privileged communication. Tr. 35-38.
The present contention that the other depositions be suppressed as improvidently taken was not made until March 14th, when counsel filed his present rule to exclude them, primarily because of the alleged conflict of interest in counsel of the MC firm.[10]
At the time he withdrew from the deposition room with his client Girouard, Mr. Simon was queried as to whether he intended to be present for the other depositions. (These other deponents and all counsel were then present in accordance with prior notice and subpoena.)
Mr. Simon replied that he intended to be so, but that he also intended to exercise his right to protect the interest of his client Girouard by seeking a protective order to limit or terminate Girouard's deposition. Mr. Simon said he was unwilling to sit there and permit opposing counsel to ask Girouard additional questions of this nature because of the possibility of self-incrimination and the possibility of violation into the confidential relationship of attorney and client that had existed. See pp. 8-10, Girouard deposition of February 22, 1968.
Mr. Simon did not ever ask that opposing counsel suspend the six other eye-witness depositions so that, as to them, he could obtain a protective order under Article 1454. In fact, he never sought one. If opposing counsel had suspended taking these other depositions, then Mr. Simon could have reasonably contended that, because he had not demanded their suspension, his client was not liable under Article 1454 for the counsel fee, subpoena costs, and other heavy expenses for the unnecessary suspension of these six eye-witness depositions.
We do not find impressive Mr. Simon's contention that it was necessary for him to leave the deposition room in order to protect Girouard from oppressive examination, that is, to seek a protective order under Article 1454. His client could incur no sanction for refusing to answer further questions until after his opponents had first secured a court order that he do so. LSA-CCP Articles 1511, 1512. Mr. Simon could simply have ordered his client to cease answering further questions (as he in fact did), without also at the same time absenting himself from the deposition room while the other depositions were being taken. He could have sought his protective order as to Girouard after he had participated in these other depositions, rather than simply walking out on them.
Considering all of these circumstances, we conclude: (a) that Mr. Simon's absenting himself from the six eye-witnesses' depositions was not pursuant to any request for a protective order as to them, (b) that therefore his absence from the taking of these other depositions was not excused by any protective feature of Article 1454, but was rather a willful absenting himself with the result that without legal justification the taking of depositions for which there had been due prior notice would have been obstructed or delayed, and (c) that this evaluation is corroborated by his failure, in his action motion *413 to terminate or limit the examination under Article 1454, to request any relief as to the continuation (non-suspension) of these other discovery depositions.
We therefore affirm the trial court's failure to suppress these depositions.
Decree.
We set aside the ruling of the trial court which refused to disqualify Mouton, Champagne & Colomb from further representation of Pennsylvania Millers Mutual Insurance Company. We remand this motion for further proceedings not inconsistent with the views expressed in this opinion. We affirm the ruling of the trial court refusing to suppress the discovery depositions. Costs of these supervisory proceedings in this court are assessed one-half to the defendant Girouard, and one-half to the defendant Pennsylvania Millers Mutual Insurance Company; all other costs to await further determination.
Trial court rulings in part affirmed; remanded.
CULPEPPER, Judge (dissenting).
I agree with the law as set forth in the very scholarly majority opinion. However, it is my view that an application of these legal principles to the facts of the present case requires that the MC firm be disqualified.
On the facts, the majority reaches the conclusion: "The record does not show whether Mr. Babin's first association with the case was in his capacity as counsel retained for Girouard by Pennsylvania through the policy clause conferring Girouard's advance consent." The majority has remanded the case for further evidence on this issue.
I think the record shows conclusively that Mr. Babin's first association with this case was in his capacity as personal counsel for Girouard. Babin is Girouard's nephew. This is the reason he was selected by Girouard to represent him. Babin testified Girouard first contacted him to file an answer to Brasseaux's petition in this case. A portion of Babin's testimony is as follows:
"Q Is itwithout going into the contents of it, I ask you to inform the Court whether or not you consulted with Mr. Ray J. Girouard as to the allegations contained in the original petition filed by Mr. Brasseaux in your capacity as Counsel for him?
"A Yes, rather he consulted me about it.
"Q What I mean to say by consult, did you have a conference with him, and without disclosing the natureI mean, the content of that conference to this Courtdid you have a conference with him leading to the formulation of pleadings that you eventually filed in response to this law suit?
"A Yes, I had conferences with Mr. Girouard regarding this law suit.
"Q Without again divulging the content of the conference itself, can you characterize that conference as being that Mr. Girouard made a full and fair disclosure of all material facts of which he had knowledge in connection with your preparation of his answer and representation of him generally as to the claim asserted by Mr. Brasseaux?
"A Well, certainly I requested that Mr. Girouard fully advise me as to the matter and whether or not he did, I have no way of knowing.
"Q What you are saying is that you do not know if he withheld anything from you, is that what you are saying?
"A Right."
A reading of the entire testimony of Mr. Babin shows he was initially consulted and employed as Girouard's own attorney. There is not even a suggestion or implication *414 that initially he was counsel supplied by the insurer for Girouard.
Furthermore, as I recall, the MC firm admitted in oral argument before this court that Babin is Girouard's nephew and he was contacted by Girouard to represent him as his personal counsel. It was not discovered until later that Girouard had insurance with a company represented by the MC firm, at which time, of course, the conflict of interest became apparent.
For the reasons assigned, I respectfully dissent from that portion of the majority decision which remands the case to the trial court for further evidence.

On Application for Rehearing.
En Banc. Rehearing denied.
CULPEPPER, J., dissents from the denial of a rehearing.
MILLER, J., not participating.
NOTES
[1] Section 6. Adverse influences and conflicting interests.

It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.
The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.
[2] Section 37. Confidence of a client.

It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them shall accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer shall not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.
If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened.
[3] Both of these commentaries suggest that disqualification has been unrealistically applied by the courts to instances where no serious impairment of confidence is threatened.
[4] This law school text cites or includes excerpts from several decisions, the most important of which are: Laskey Bros, v. Warner Brothers Pictures, Inc., 224 F.2d 824 (CA 2, 1955); Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 135 A.2d 252 (1957); Hutson v. Superior Court, 203 Cal.App.2d 687, 21 Cal.Rptr. 753 (1962); United States v. Standard Oil Co., 136 F.Supp. 345 (D.C. 1955).
[5] Article XIII, Section 3, on the articles of incorporation of the Louisiana State Bar Association authorizes the association's Committee on Professional Ethics and Grievances to render advisory provisions on professional ethics. (It includes the further proviso that no member of the bar shall be subject to disciplinary action if he has prior to questioned action received a written advisory opinion that such action is justifiable.) Many of these opinions are published in the Louisiana Bar Journal, being cumulatively indexed by canon (to that date) at 14 La.Bar J. 237-42 (1967).

At that time there were 29 opinions regarding potential or actual conflicts of interest under Canon 6. All of them are ingeneral accord with the principles summarized in the text of this opinion. Opinion 102, for example, represents a full discussion of various actual and potential conflicts arising in a multi-plaintiff tort suit; in advising against joint representation, the committee emphasized that in case of doubt the attorney should lean backward to avoid being put in the position of representing conflicting interests. 12 La.B.J. 175, esp. 181-3 (1964). Similarly, Opinion 186, for instance, advised that it would be improper for two attorneys sharing offices and letterhead, although not actually associated or in partnership, to avoid representing conflicting interests because of the canon and its implied mandate to the profession to avoid "even the appearance * * * in the eyes of the lay public" of the representation of conflicting interests by associated attorneys. 12 La.Bar.J. 230 (1964).
[6] "Retainer" is the client's act in selecting an attorney to represent him, and the attorney's acceptance of this duty. Black's Law Dictionary p. 1479 (4th ed., 1951); 37A Words & Phrases 194 (1950 ed.). These sources note that the term also denotes the initial fee which a client may pay an attorney in retaining him. However, the canons use the term in the former sense in indicating when the duty of fidelity to the client's interest arises when there is agreement to represent him as attorney, not when there is payment or agreement to pay for representation.
[7] In the previously cited article, Mr. Kaplan criticizes some of the cases which have upheld waiver, suggesting that such a waiver by a former client might be ineffective against the policy of the canons. 31 NYU L.Rev. 924-26. Some of the decisions have so held.
[8] The motion was tried under the assumption that representation of technically conflicting interests in the insurer-insured relationship is a matter for bar association evaluation rather than compulsory withdrawal order. Likewise, the record reflects misapprehension of counsel that the lawyer-client privilege attaches to communications regarding retainer (it may not in circumstances such as the present; see text below), that Canon Six prohibitions apply only to law-firms and partners and do not come into play because of prior representation by an employed law-associate, or that they apply only where retainer results from a compensated attorney-client relationship (whereas they regulate gratuitous attorney-client relationships also).
[9] LSA-CCP Article 1454 ("Motion to terminate or limit examination") in full provides:

At any time during the taking of the deposition, on motion of any party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or in which the judgment was originally rendered may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Article 1452. If the order made terminates the examination, it shall be resumed thereafter only upon the order of the court. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. In granting or refusing such order the court may impose upon either party or upon the witness the requirement to pay such costs or expenses as the court may consider reasonable. (Italics ours.)
[10] This motion was made in response to Pennsylvania's motion for summary judgment based upon these depositions, which allegedly showed without dispute that Girouard's shooting of Brasseaux was intentional (so that Pennsylvania's clause excluding coverage for intentional injuries came into effect). The trial court overruled this motion for summary judgment.